IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MITCHELL TAYLOR, | ) | 4:04CV3315 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| THE GOODYEAR TIRE AND | ) | |
| RUBBER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Mitchell Taylor, a white male, was fired from his position at the Lincoln, Nebraska production facility of The Goodyear Tire and Rubber Company ("Goodyear") after he admitted falsifying his timecard. Taylor asserts that his termination was reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and the Nebraska Fair Employment Practices Act (FEPA), Neb. Rev. Stat. Ann. §§ 48-1101 et seq. (LexisNexis 2002 & 2005 Cum. Supp.). Goodyear has moved for summary judgment, and I will grant the motion.

## I. BACKGROUND

Goodyear objected to the declarations submitted by Taylor in opposition to the motion for summary judgment on the basis of form and on substantive grounds. As to form, Goodyear asserts that Taylor's submission did not meet the standards of 28 U.S.C. § 1746. Taylor moved for leave to file corrected declarations (filing 36). Each of Taylor's "corrected" documents contains a provision in the body of the document that the statements therein, and in the original declaration, were made under penalty of perjury. The original declarations are attached to the "corrected" declarations. Goodyear objected to Taylor's motion seeking leave to file corrected

declarations, asserting that the documents are not in "substantially the . . . form" specified by 28 U.S.C. § 1746, in part because the recitation that the statements therein were made under penalty of perjury was made in the body of the document. Without ruling on whether 28 U.S.C. § 1746 requires a specific form of declaration, I will grant Taylor's motion to file corrected declarations (filing 36) and consider the declarations submitted in filing 38 to be properly filed.[1]

In determining the material facts before me, I have considered the substance of Taylor's "corrected" declarations, to the extent they were made on personal knowledge, set forth facts that would be admissible in evidence, and affirmatively showed that the declarant was competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). I need not reach Goodyear's evidentiary objections to Taylor's evidence (see filing 33), as Taylor's evidence does not create a genuine issue of material fact even if I consider it.

Considering the facts in the light most favorable to the Plaintiff, the material undisputed facts are set forth below.[2]

---

[1]I subsequently cite only to the declarations initially submitted by Taylor in filing 28, attached as exhibits to the "Second" declarations. For instance, Ex. A to filing 38 is the Taylor Second Decl., and attached as Exhibit A to that document is the Taylor Decl. found in filing 28. For simplicity, I cite this as "Taylor Decl." I follow similar conventions for the other filing 28 declarations attached as exhibits to filing 38:
    Ex. A to Filing 38 Ex. B, Bayne Second Decl. (hereinafter "Bayne Decl.");
    Ex. A to Filing 38 Ex. C, Clardy Second Decl. (hereinafter "Clardy Decl.");
    Ex. A to Filing 38 Ex. D, Tlamka Second Decl. (hereinafter "Tlamka Decl.");
    and Ex. A to Filing 38 Ex. E, Smith Second Decl. (hereinafter "Smith Decl.").

[2]These are largely taken from Goodyear's statement of facts in its brief supporting its motion for summary judgment. Taylor did not controvert those facts, although he submitted additional facts and asserted that different legal conclusions should result from those facts. When a moving party's statement of facts is

1.      Goodyear has production and shipping operations in Lincoln, Nebraska. In 2003, the year of Taylor's discharge, Goodyear employed a total of approximately 1,050 people at its Lincoln plant, of whom approximately 93.4% were Caucasian. Caucasians made up approximately 93.7% of the management force that year. (Marschman Decl. ¶ 2; Konneker Decl. ¶ 2; Ex. 1.)

2.      Approximately 6 months after September 13, 1999, Taylor was moved to the Positive Drive Department, where he served as an Area Manager until his termination on April 5, 2003. The Area Manager position is a supervisory position. (Marschman Decl. ¶ 3, Taylor Dep. 20:3-22.)

3.      At all time during his employment as an Area Manager, Taylor was treated by Goodyear as a salaried exempt employee under federal wage and hour laws. Taylor and the other Area Managers were entitled to their full salary every

---

unopposed, those facts are deemed admitted. NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.")

Goodyear's evidence is contained in filings 25 and 31. I have followed these citation conventions:
   Filing 25, Ex. A, Taylor Dep. (excerpts) (hereinafter "Taylor Dep.");
   Filing 25, Ex. B, Marschman Decl. (hereinafter "Marschman Decl.");
   Filing 25, Ex. C, Shultz Decl. (hereinafter "Shultz Decl.");
   Filing 25, Ex. D, Horn Decl. (hereinafter "Horn Decl.");
   Filing 25, Ex. E, Konneker Decl. (hereinafter "Konneker Decl.");
   Filing 31, Ex. F, Taylor Dep. (excerpts not included in filing 25) hereinafter "Filing 31 Taylor Dep.");
   Filing 31, Ex. G, Caster Decl. (hereinafter "Caster Decl."), and
   Filing 31, Ex. H, Tlamka Supp. Decl. (hereinafter " Tlamka Supp. Decl.").
Marschman's and Shultz's names are spelled as they appear in their signatures to their declarations, although the submissions of the parties contain variants of that spelling.

week in which they performed any work regardless of hours worked, subject to policies regarding sick leaves and vacation. Like other Area Managers, on those occasions when Taylor worked overtime, he was paid an hourly overtime rate. (Konneker Decl. ¶ 4, Taylor Dep. 20:23-21:20, 24:20-25:4, 134:15-135:1.)

4. At a meeting in August, 2002, at which the three Positive Drive Area Managers, Shultz and Konneker were present, it was agreed among the Area Managers that they would call each other first when overtime was needed and call David Bayne, an hourly worker who sometimes filled in for Area Managers, or others to fill in only if another Area Manager was not available. (Shultz Decl. ¶ 2.)

5. Taylor's direct supervisor in Positive Drive was Dennis Schultz ("Shultz"), who is a Caucasian male. At the time of the decision to terminate Taylor, Schultz reported directly to Gary Marschman ("Marschman"), who is also a Caucasian male. Marschman, at the time of the termination decision regarding Taylor, reported directly to Bill Baird, ("Baird"), who also is a Caucasian male. Bob Horn, a Caucasian, was the Human Resources Manager at the Goodyear Lincoln facilities from April 1, 1998 through January 1, 2002. Additionally, Paula Konneker and Bob Lindsay, the Human Resources Department representatives who were consulted concerning Taylor's termination, are both Caucasians. Todd Turner, the Plant Manager, is also Caucasian. (Taylor Dep. 26:22-25, 113:2-8; Shultz Decl. ¶ 2; Marschman Decl. ¶ 1; Konneker Decl. ¶ 5.)

6. Taylor was one of three Area Managers in the Positive Drive department, with each Area Manager assigned to one of three daily eight-hour shifts. The other Area Managers in Taylor's department from approximately 2000 until the time of Taylor's discharge were Wayne Clardy and Petra Misner. Clardy is Caucasian. Misner is African American. (Taylor Dep. 62:24-63:5; 63:20-23; Shultz Decl. ¶ 2.)

7. After the fact, Misner told Marschman that she contacted Bayne, not Taylor to work overtime to cover for her on March 14, 2003, because Taylor had previously told Misner that he had another job that did not permit him to work overtime at the time she needed a fill-in for that night. (Marschman Decl. ¶ 7 & Ex. 1.)

8. Taylor falsified his timecard by recording that he worked four hours of overtime on the March 14, 2003, night shift when he worked no overtime on that shift. Taylor signed the falsified timecard and turned it in. He received payment from Goodyear for the overtime that he falsely claimed to have worked and he kept the money. (Taylor Dep. 111:8-112:3, 113:9-115:5; Shultz Decl. ¶¶ 6 & 7; Marschman Decl. ¶ 7.)

9. Though Taylor told Bob Tlamka and Sue Smith, coworkers not in his chain of supervision, that he intended to report overtime he had not worked as a protest, Taylor did not tell his superiors in advance of turning in the timecard.[3] (Taylor Dep. 111:25-112:16.)

---

[3]Taylor's declaration indicates he told Shultz about his intention to falsify his timecard in advance. (Taylor Decl. ¶¶ 7 & ¶ 12.) I disregard Taylor's declaration on this point, as it is in direct contradiction to Taylor's clear deposition testimony that he did not tell Schultz or Shultz's supervisor, Marschman, prior to turning in the falsified timecard. (Taylor Dep. 111:25-112:12, 113:9-114:2, 115:6-17, 125:10-15.) Under Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1366 (8th Cir. 1983), subsequent affidavits or declarations contradicting prior deposition testimony without evidence of some type of confusion on the part of the affiant regarding the previous deposition testimony are barred as creating sham issues of fact rather than genuine issues of fact. As there is no evidence of any confusion regarding Taylor's prior deposition testimony, I have not considered the sham issues raised by his subsequent declaration.

10. Robert Tlamka was the night shift coordinator. In that capacity, he "had the overall charge of the plant's production operations during the night shift and generally had the overall supervisory position for the plant's operation during the night shift." (Tlamka Decl. ¶ 1.) Tlamka was not in the supervisory chain over Taylor and lacked authority to approve Taylor's time schedule or time records. (Marschman Decl. ¶ 8.)

11. Taylor told Tlamka in advance of signing the falsified time card that he planned to record unworked overtime. (Tlamka Decl. ¶ 7.) Tlamka "told Taylor . . . to make sure that Dennis Schultz knew that Taylor was reporting unworked hours on Taylor's timecard for that night." (Tlamka Supplemental Decl. ¶2.) Tlamka "told Taylor to be careful what he did, but . . . did not tell him not to take such an action." Tlamka Decl. ¶ 9. Tlamka did not talk with Schultz about Taylor's plan, as Tlamka did not consider it his place to do so. Tlamka considered it Shultz's responsibility to check and approve time cards for the Area Managers who reported to him." (Tlamka Supp. Decl. ¶ 2.)

12. Sometime shortly after March 14, 2003, one of the other Area Managers who was supervised by Shultz, Wayne Clardy, who is Caucasian, told Shultz that he should check Taylor's timecard covering March 14. Shultz checked the time cards for the three Area Managers covering that date to see if the reported time added up to 24 hours. Taylor's timecard showed four hours of overtime on that date, but Misner's showed four hours of working time and four hours of vacation, and Clardy's timecard showed eight hours of work. Since the time worked out to 24 hours for the day, Shultz looked no further. (Shultz Decl. ¶¶ 2 & 3.)

13. On March 21, 2003, Petra Misner, an African American woman, sent an email to Gary Marschman, Shultz' supervisor, stating that Taylor had reported four hours of overtime on March 14, but that the overtime actually had been worked by David Bayne. Marschman discussed this email with Shultz. Schultz obtained and

reviewed Bayne's timecard and found that he had reported four hours of overtime on the same day as Taylor. Schultz reported his finding to Marschman. Marschman arranged a meeting between Taylor, Shultz and Marschman to get Taylor's explanation. (Shultz Decl. ¶¶ 4 & 5; Marschman Decl. ¶ 7 & Ex. 1.)

14. At the meeting, held on April 4, 2003, in Marschman's office with Taylor, Shultz and Marschman in attendance, Taylor admitted that he had falsified the timecard, that he had not worked any of the overtime hours that he had reported for March 14 and for which he signed the timecard, and that he had accepted the money for it. Marschman immediately suspended Taylor. (Taylor Dep. 124:10-125:15; Shultz Decl. ¶¶ 6 & 7, Marschman Decl. ¶ 7.)

15. The following Goodyear work rule is applicable to supervisory employees:

> Section 9.03 - <u>DISCHARGE</u>
>
> Associates are subject to immediate discharge in cases of gross misconduct such as theft, fraud, insubordination, possession of illegal drugs and similar situations. Associates are subject to discharge when they fail to perform their job responsibilities satisfactorily for reasons the Company believes to be within the associate's control, such as lack of effort, lack of cooperation, poor attendance or other similar reasons. These situations generally will be addressed by counseling and progressive discipline prior to discharge.

(Taylor Dep. 126:18-127:2 & Ex. 13.)

16. After conducting a further investigation, Marschman called Taylor in to a meeting at the Company's personnel office conference room on April 8, 2003. Present at the meeting were Taylor, Marschman, Marschman's supervisor Bill Baird

and Human Resources representative Paula Konneker.[4] At the meeting Taylor was told that he was discharged from employment for falsifying his timecard and accepting payment for the falsified hours. The discharge was based upon the first sentence of Section 9.03 of Goodyear's policies. Taylor's discharge was effective on April 5, 2003. (Marschman Decl. ¶¶ 9 & 10, Konneker Decl. ¶¶ 6 & 7; Taylor Dep. 102:19-21; 126:18-127:2.)

17. At the meeting on April 4, 2003, when he was suspended, Taylor said that he falsified his timecard to make a point, which was that Misner should have called him, not Bayne, to work the overtime on March 14, 2003. Taylor also claims that he was making a point that Miner was allowed to arrive late and take long lunches without being held accountable for it. (Marschman Decl. ¶ 7; Shultz ¶¶ 6 & 7; Taylor Dep. 106:13-17; 124:7-126:5.)

18. Taylor filed no charges against Goodyear with the NEOC, the U.S. Equal Opportunity Commission, or any other anti-discrimination agency, other than the charge he filed concerning his discharge from employment at Goodyear which is the subject of this lawsuit. Goodyear maintains a toll-free telephone number for employees as an avenue for them to notify Goodyear about circumstances that the employee believes to be discriminatory. The Lincoln plant has never been advised that Taylor has made any call to the toll free number for any purpose. (Caster Decl. ¶ 6.)

19. Taylor was aware of the Goodyear Zero Tolerance Policy that provides, on its face, a toll-free telephone number for employees to use in the reporting of discriminatory behavior. Additionally, Taylor was required to attend non-

---

[4] Taylor testified in his deposition that Bill Baird conducted the termination meeting. Marschman states that he conducted the termination meeting. Whether Baird or Marschman conducted the termination meeting is not material since the material content of the meeting is not in dispute.

discrimination classes at Goodyear on a yearly basis, where employees were instructed on the procedures for making discrimination complaints, and, again, provided with a toll-free telephone number to facilitate such complaints. (Taylor Dep. 53:14-55:11 & Ex.'s 5 & 6.)

20.     Marschman asked Shultz to review time cards going back three months to see whether the time cards disclosed any time reporting irregularity on the part of any of the three Area Managers in Taylor's department. Shultz found no irregularities. (Shultz Decl. ¶¶ 11 & 12; Marschman Decl. ¶ 8.)[5]

21.     Misner committed to work additional hours when she came in later or had to take time off during the day. Schultz permitted all of the Area Managers flexibility in their schedules if they made up the time. All three of the Area Managers availed themselves of this flexibility from time to time. For example, for a period of time Misner took time off in the middle of her shift to pick up her son from a work release program. She asked Shultz in advance for permission to take the time off necessary to do so and agreed to work extra hours on weekends and other days to make up for it. Shultz agreed to her request. To the best of Shultz' knowledge, Misner made up the hours. (Horn Decl. ¶¶ 2-4; Taylor Dep. 27:1-28:1; 43:1-44:10; 105:13-106:17; Ex. 3; Schultz Decl. ¶¶ 8 - 10.)

22.     In 1999, Misner was warned about taking a vacation for which there was no record of the submission of vacation request slips for some of the days. Misner reported vacation on her timecard and was not paid for the days she was off of work. Vacation slips were located for some of Misner's vacation days, but not all of them, resulting in a discrepancy in her vacation bank. When questioned, Misner said that

---

[5]This is, verbatim, statement no. 16 in Goodyear's statement of facts. (Filing 24, Goodyear Br. In Supp. Of Mot. For Summ. J at p.7.) Taylor did not controvert this fact and it is deemed admitted. See n.2, supra.

she had submitted vacation request forms for the vacation days that she took. Previous problems in the payroll department had occurred, resulting in lost vacation forms. The presence of some of the vacation forms was taken into account when Goodyear decided to issue a warning to Misner. Additionally, the fact that previous payroll department problems had resulted in lost vacation forms led Goodyear to warn and not discharge Misner. In 2000, Misner was warned again about her attendance, related to an absence under the Family and Medical Leave Act. After the 2000 warning, the Plant's Human Resources Manger, Bob Horn, heard no other complaints about Misner. (Horn Decl. ¶¶ 3-5; Marschman Decl. ¶ 11.)

23.     After Taylor was discharged on April 8, 2003, Taylor presented Marschman with a calendar showing dates in the first half of 2002 when Taylor said Misner was late or took several hours off. Upon checking the time cards, the extended periods of absence were all reported on her time card as vacation pay or illness. She reported eight hours of work on the occasions when Taylor said she was an hour late. This was consistent with Shultz's practice of flexibility and Misner committed to make up the time. After Shultz noted excessive tardiness by Misner, and after Taylor complained to Shultz of Misner's tardiness, Shultz spoke with Misner about her tardiness during the first half of 2002, and to the best of his knowledge she improved. Misner never falsified her timecard as far as either Shultz or Marschman are aware. In particular, Misner never reported overtime that she did not work. There are no entries on Taylor's calendar after May, 2002, and he kept no calendar on Misner during 2003. (Taylor Dep. 68:25-69:13; 72:11-73:5, Shultz Decl. ¶¶ 8 - 12; Marschman Decl. ¶¶ 10 & 11.)

24.     Taylor admits that the first time he told his supervisors or anyone higher in the management chain that he was keeping this calendar was during the termination meeting. (Taylor Dep. 73:2-6.)

25.     On April 2, 2001, Goodyear discharged Plant production employee Jerome Turner. Turner falsified insurance enrollment documents by claiming as his wife a woman to whom he was not married and he received insurance benefits for her. He was discharged for that reason. Turner is African American. (Horn Decl. ¶ 7 & Ex. 4.)

26.     Gary Caster, Human Resources Manager of the Goodyear Lincoln plant since March 1, 2005 and a member of the human resources department since 1992, stated that Sue Smith's October 1999 transfer from one production function to another "did not result in any change in her wages, benefits or opportunities for advancement." (Caster Decl. ¶¶ 1 & 3.)

27.     In 2002, Clardy had the highest rating of any of the five area managers who reported to Shultz. Though Clardy did not receive a raise in 2002, no other managers received raises that year because there was a wage freeze for 2002. (Caster Decl. ¶ 7.)

28.     In 2003, Smith and Clardy retired after accepting an enhanced retirement benefit that was offered as part of a voluntary reduction in force of eligible management employees. (Caster Decl. ¶ 4.)

## II. ANALYSIS

The parties agree that the McDonnell Douglas[6] burden shifting framework applies to this case, as there is no direct evidence of discrimination. Under that framework, Taylor has the initial burden to establish a prima facie case by showing that (1) he is a member of a protected class; (2) he was meeting Goodyear's legitimate job expectations; (3) he suffered adverse employment action, and (4) similarly

---

[6]McConnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

situated employees outside the protected class were treated differently. Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004). If a prima facie case is established, then Goodyear must produce evidence of a legitimate nondiscriminatory reason for its action. If a nondiscriminatory reason is proffered, Taylor must produce evidence that the proffered reason is a pretext for discrimination. Id.

Taylor acknowledges that under Woods v. Perry, 375 F. 3d 671, 673 (8th Cir. 2004), a plaintiff asserting a reverse discrimination claim where there is no direct evidence of discrimination must also show as a part of the prima facie case that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." (Filing 29, Pl.'s Br. in Opp'n to Summ. J., at 18, 20-22.) Taylor asserts that imposition of this additional requirement in reverse discrimination cases is unconstitutional. Id. I am not free to disregard settled law in this circuit, and thus reject Taylor's assertion that the imposition of the additional burden in reverse discrimination cases is unconstitutional.

### *Prima Facie Case*

The parties dispute whether Taylor has shown that he was meeting Goodyear's legitimate expectations. Goodyear asserts that he could not possibly have been meeting expectations, since he admitted falsifying his timecard. However, Taylor has brought forth evidence that keeping an accurate timecard is not always required by Goodyear. Goodyear permits area managers to report a full 8 hours of work on their timecard even if they were not present for the full 8 hours. For purposes of this motion for summary judgment, I find that Taylor has established that he was meeting Goodyear's expectations.

The parties also dispute whether Taylor has shown that he was treated less favorably than a similarly situated comparator. Taylor has put forth Petra Misner as

a comparator. I find that Taylor was not similarly situated to his proffered comparator.

Coworkers are not appropriate comparators to a terminated plaintiff unless they dealt with the same supervisor, were subject to the same standards, and "engaged in the same conduct without any mitigating or distinguishing circumstances." Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003) (internal citation omitted). Close examination of the conduct of Taylor and Misner shows that they did not engage in the same conduct, and that any "wrongdoing" by Misner was less serious than that of Taylor.[7]

Taylor claimed unworked overtime on his time card and accepted pay for that falsely reported overtime. He admitted this in an investigatory meeting with his supervisors. There is no evidence that Misner falsely reported overtime. At most, there is evidence that Misner utilized the flexibility policy and promised to work extra hours to "cover" the times during her regular eight-hour shift that she reported as working when she was in fact not present. Misner is not a suitable comparator to Taylor unless her supervisors were aware that she was dishonest, in that she failed to

---

[7]I reject Taylor's assertion that his timecard falsification should be ignored because his action was taken as a protest to what he perceived as favored treatment of Misner. His motive for misconduct is irrelevant to the analysis of the nature of his misconduct.

In addition, the "protest" argument fails factually. It rests on Taylor's claim that he had no other avenue to protest perceived favorable and disparate treatment of Misner. Yet Taylor did not tell his supervisor about favored treatment of Misner, and no one reported this "reverse discrimination favorable mistreatment" of Misner to the 24-hour toll-free hotline maintained by Goodyear. In addition, Taylor's fears of reprisal were unfounded. Though he asserts that coworkers Smith and Clardy were subject to adverse employment actions when they complained about Misner, Goodyear has proffered uncontroverted evidence that Smith's transfer was not an adverse employment action, and that the year Clardy failed to get a raise, no management employees received a raise due to a company-wide freeze.

cover her missed regular shift hours as promised. There is no evidence that Misner admitted that she broke her promise to "cover" her unworked hours, or that her superiors were aware that she was abusing the "flexibility policy" by failing to cover her hours as promised.[8]

Under Johnson v. Ready Mixed Concrete Co., 424 F.3d 806 (8th Cir. 2005), even if Misner's supervisors were aware that she was abusing the "flexibility" policy by failing to "cover" unworked hours as promised (and they were not), Misner is not an appropriate comparator because her misconduct is different from that of Taylor. The facts of Ready Mixed are quite similar to those before me, and bear close examination.

In Ready Mixed, the plaintiff was discharged due to his employer's belief that he was dishonest in intentionally concealing acid damage to his company truck and falsifying company records. The plaintiff failed to prove he was similarly situated to two white co-workers who also had acid damage to their trucks but were not discharged. There was no evidence that the co-workers misrepresented any facts or

---

[8]Taylor claims that Misner must have been abusing the policy, because he and others saw her time card over a period of time when she was reporting 8 hours of work but not working the full 8 hours, and they did not see "makeup time hours" recorded on the time cards. He also asserts that coworkers "knew" that Misner did not actually make up the hours, because they were aware of when she was in the plant and did not think she was at work long enough to be putting in "makeup time hours." Assuming these assertions are true, they are insufficient to create a material question of fact as to whether Taylor and Misner are similarly situated. At most, they show that coworkers at Misner's level or below knew Misner had broken her promise to make up hours. They do not establish that Misner's superiors knew she had broken this promise. The record shows much grumbling about Misner among Misner's fellow workers, but only one specific complaint about Misner to her superior. This was Taylor's 2002 complaint to Shultz about tardiness, which resulted in Shultz talking to Misner about the problem and what Shultz perceived as improvement in this area of Misner's performance.

attempted to conceal the damage from the employer, particularly when the evidence showed that the supervisors of the two white co-workers observed the acid damage to his company truck. The court observed that "[v]iolations of different company policies do not necessarily support an inference that employees are similarly situated, particularly when one violation is considered more serious than the other."

Even if there were evidence that Misner's superiors knew she broke her promise to make up missed hours, and there is not, such a violation by Misner would be less severe than that of Taylor.  Misner and other Goodyear area managers are salaried exempt employees under federal wage and hour laws, and are entitled to payment of their base salary whether or not they worked all eight hours of their regular eight-hour shifts.  If Misner broke a promise to make up time under the flexibility policy, this misconduct would not be "theft" or "fraud" under the Goodyear work rule making workers subject to immediate discharge "in cases of gross misconduct such as theft [or] fraud . . ."  (Taylor Dep. 126:28-127:2 & Ex. 13.)  By contrast, when Taylor claimed and accepted <u>overtime pay</u> to which he was admittedly not entitled, that misconduct was "theft" or "fraud" under the discharge policy.

*Additional Requirement in Reverse Discrimination Case*

It is possible to "show suspicious background circumstances by showing evidence that [the employer] is inclined to discriminate invidiously against [the majority] or something 'fishy' about the facts that raises an inference of discrimination."  <u>Woods</u>, 375 F.3d at 674.  Taylor has not made the necessary showing.

For purposes of showing a prima facie case, a plaintiff established that her employer has discriminated against the majority by showing "several examples" of the employer's imposition of different discipline on white and Hispanic teachers who had improperly punished children in the same way.  <u>Walker v. Panhandle Cmty Serv.</u>,

-15-

371 F. Supp. 2d 1093, 1096 (D. Neb. 2005).  Here, Taylor asserts more favorable treatment of only one African-American woman, and has not shown that she engaged in the same behavior he did.  The declarations of co-workers submitted by Taylor do not establish that Goodyear discriminates against the majority, or create a question of fact on this issue.  Those declarations are based on the beliefs or personal opinions of the declarants, and are unaccompanied by reference to specific instances in which a white person and person of color engaged in the same behavior yet the white worker was treated less favorably.[9]  Taylor has failed to establish that Goodyear is the unusual employer who discriminates against the majority, particularly in light of the fact that at least one African American employee (Turner) who falsified information to receive insurance benefits to which he was not entitled was terminated.

### *Ultimate Burden:  Was Taylor Terminated because of Race?*

As Taylor has failed to show that he was treated less favorably than a similarly situated employee, and has failed to show that Goodyear is the unusual employer who discriminates against the majority, he has failed to establish a prima facie case.  For that reason, summary judgment must be entered in favor of Goodyear.  Furthermore,

---

[9] I briefly cite selected declarations submitted by Taylor to demonstrate their inadequacy on this issue.  One coworker opined that Goodyear supervisors treated people of color more favorably than whites in "the same situation," as Goodyear wanted to avoid possible discrimination claims, but listed no specific situations. (Clardy Decl. ¶ 4.)  That same coworker opined as follows:  "I believe that Goodyear's policy implemented by Marshman, Schultz, and Konneker were to treat people of color differently.  Misner was treated differently than others." (Clardy Decl. ¶ 23.)  Tlamka, the night shift supervisor, stated "I felt there was an unwritten policy that people of color could and would be treated differently because of Goodyear's fear of an equal opportunity commission complaint." (Tlamka Decl. ¶ 4.) Tlamka also opined that "Misner was treated differently as a person of color, and I firmly believe that Goodyear's policy has been to treat people of color differently including Misner." ( Tlamka Decl. ¶ 18.)

even if Taylor has established a prima facie case, and he has not, he has failed to meet the ultimate burden of proving that he was terminated because he was not a person of color.

The ultimate question is whether there is a genuine issue for trial on the issue of whether the plaintiff was discharged <u>because of his race</u>. <u>Ready Mixed</u>, 424 F.3d at 812 (emphasis in original). If Goodyear was motivated by a good faith belief that Taylor had falsified his time card, then it was not motivated by his race. <u>Id.</u> at 811 ("If the employer was motivated by a good faith belief that [the terminated employee] was dishonest, then it was not motivated by his race.") Taylor has produced no evidence showing that Goodyear's stated reason for terminating him was a pretext for discrimination.

*State Law Claim*

Taylor also brings a second cause of action under the Nebraska FEPA, Neb. Rev. Stat. Ann. §§48-1101 to 48-1125 (Lexis 2002). The state law claim fails for the same reasons as the Title VII claim. NFEPA is patterned after Title VII, and Nebraska courts look to federal decisions in construing it. <u>See</u> <u>Father Flanagan's Boys' Home v. Agnew</u>, 256 Neb. 394, 401, 590 N.W.2d 688, 693 (1999); <u>City of Fort Calhoun v. Collins</u>, 243 Neb. 528, 532, 500 N.W.2d 822, 825 (1993); <u>Airport Inn v. Nebraska Equal Opportunity Comm.</u>, 217 Neb. 852, 856, 353 N.W.2d 727, 731 (1984); <u>Malone v. Eaton Corp.</u>, 187 F.3d 960, 962 n. 3 (8th Cir.1999).

### III.  CONCLUSION

Taylor has failed to establish a prima facie case of reverse discrimination because he has failed to show that he was similarly situated to the comparator he has identified, or that Goodyear is the unusual employer who discriminates against the majority. Nor has Taylor not set forth evidence sufficient to raise a genuine issue to

be tried on the ultimate question whether his termination was motivated by race. I will grant summary judgment in favor of Goodyear on all claims.

Accordingly,

IT IS ORDERED:

1. Plaintiff's Motion for Leave to File Corrected Affidavits and Declarations (filing 36) is granted and the documents in filing 38 are deemed properly filed.

2. Goodyear's motion for summary judgment (filing 23) is granted as to all claims; and

3. Judgment shall be entered by separate order.

December 16, 2005.    BY THE COURT:

*s/Richard G. Kopf*
United States District Judge